**NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Mfg. Corporation and NTN Corporation, Plaintiffs,**

v.

**UNITED STATES, United States Department of Commerce, and Ronald H. Brown, Secretary of Commerce, Defendants,**

**The Timken Company, Defendant–Intervenor.**

**Slip Op. 94–108.**
**No. 92–03–00167.**

United States Court of International Trade.

July 6, 1994.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger and Jesse M. Gerson, Chicago, IL, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: Linda S. Chang, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Julie Chasen Ross and Edith A. Eisner, Washington, DC, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Mfg. Corporation and NTN Corporation ("NTN"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("ITA" or "Commerce") final results of its second administrative review of certain tapered roller

bearings ("TRBs") from Japan. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review ("Final Results")*, 57 Fed.Reg. 4,951 (Feb. 11, 1992).

Specifically, plaintiffs claim that the ITA erred in (1) its refusal to employ a 10% maximum deviation limit on any single physical criterion employed by the ITA in their "sum of the deviation" methodology, which is used to determine similar merchandise sold in the home market; (2) basing foreign market value of TRB cups and cones sold in the United States upon prices created by splitting the price of sets sold in the home market; (3) matching U.S. sales with home market sales at different levels of trade when no sales of such or similar merchandise at the same level of trade were found in the home market; (4) its refusal to make a level of trade adjustment which would reflect the full differences in price levels between different levels of trade; (5) its refusal to use a period of six months, which represents a majority of the period of review, for purposes of the "extended period of time test" employed by the ITA as part of its test to exclude home market sales made at prices below cost of production; (6) its refusal to use the interest rate reported by NTN, which rate took compensating deposits into account, for purposes of calculating credit expenses in Japan and inventory carrying cost in the United States; (7) its use of home market sales not in the ordinary course of trade in its calculation of foreign market value, despite the statement in the final results notice that such sales would not be used; (8) that certain home market sales used by the ITA in determining foreign market value were "inadequate" under 19 U.S.C. § 1677b(b) (1988); (9) its comparison of bearings of different design types; (10) its failure to deduct discounts from the home market unit price in its analysis of whether sales were below cost of production; (11) its failure to correct certain computer errors; and (12) its refusal to issue amended final results in this review, correcting errors noted in paragraphs 7, 10, and 11. *Plaintiffs' Motion and Memorandum in Support Thereof for Judgment on the Agency Record ("Plaintiffs' Brief")* at 15–66.

Upon reconsideration of *NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. v. United States,* Slip Op. 94–96, June 8, 1994, and plaintiffs' *Motion to Amend Judgment,* this Court herein revises and re-issues this decision.

## BACKGROUND

In 1976, the Treasury published a dumping finding, T.D. 76–227, with respect to TRBs from Japan. *Tapered Roller Bearings and Certain Components Thereof From Japan,* 41 Fed.Reg. 34,974 (Aug. 18, 1976). In 1981, Commerce clarified T.D. 76–227 to cover only TRBs four inches or less in outside diameter, and certain TRB components. *Tapered Roller Bearings and Certain Components Thereof From Japan; Clarification of Scope of Antidumping Finding,* 46 Fed.Reg. 40,550 (Aug. 10, 1981). In 1982, Commerce revoked T.D. 76–227 with respect to TRBs manufactured by NTN. *Defendants' Memorandum in Partial Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendants' Brief")* at 4.

In 1987, Commerce published another antidumping duty order on TRBs from Japan. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 37,352 (Oct. 6, 1987). This order included all TRBs and parts thereof manufactured by NTN and all TRBs over four inches in outside diameter and parts thereof manufactured by other manufacturers.

In August 1991, Commerce published its final results of its first administrative review of TRBs covered by the 1987 order. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 41,508 (Aug. 21, 1991). These final results have been contested by Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo") (Court No. 91–09–00704), NTN (Court No. 91–09–00695), and The Timken Company ("Timken") (Court No. 91–09–00697).

In 1989, Commerce published a notice of opportunity to request administrative review of sales of TRBs covered by the 1987 order

for the period October 1, 1988 through September 30, 1989. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 54 Fed.Reg. 41,317 (Oct. 6, 1989). The domestic petitioner, Timken, and two respondents requested administrative review of the TRBs at issue. Consequently, Commerce initiated the second administrative review of the TRBs. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 54 Fed.Reg. 48,010 (Nov. 20, 1989). The review covered sales of TRBs by Koyo, Nippon Seiko K.K. ("NSK"), Nachi Fujikoshi Corporation ("Nachi") and merchandise manufactured by NTN and entered by Caterpillar Inc. during the review period. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 20,593 (May 6, 1991).

After Timken requested Commerce to conduct a cost of production ("COP") investigation of all four respondent companies, Commerce sent antidumping questionnaires, including a request for information to NTN, Koyo, Nachi, and NSK. Nachi responded that it had no sales to the United States during the review period. Koyo submitted revised computer tapes on August 10, 1990. NTN submitted corrections on August 21, 1990. Only NSK's information was verified during this review. *Defendants' Brief* at 5.

In May 1991, Commerce published its preliminary determination of the second administrative review. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. at 20,593. All interested parties, except Nachi, submitted case and rebuttal briefs and a hearing was held on May 24, 1991.

In February 1992, Commerce published its final determination. These final results have been contested by Timken (Court No. 92–03–00162), NTN (Court No. 92–03–00167), Koyo (Court No. 92–03–00169), and NSK (Court No. 92–03–00158).

## DISCUSSION

This Court must uphold final results of an ITA administrative review unless the ITA determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed Cir.1990).

### 1. *Model Match Methodology*

■ NTN argues that, for purposes of calculating dumping margins, Commerce compared dissimilar merchandise because it did not impose a ten percent limit upon deviation from the five-criteria model match methodology for selecting the most similar home market TRB model. *Plaintiffs' Brief* at 15–21.

The ITA asserts that when identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select "similar" comparison merchandise based upon the physical characteristics of the merchandise being compared. *Defendants' Brief* at 10–11; 19 U.S.C. § 1677(16) (1988).[1]

---

**1.** 19 U.S.C. § 1677(16) (1988) provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purpose of part II of this subtitle can be satisfactorily made:

**(A)** The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

**(B)** Merchandise—

Commerce has been granted broad discretion to devise a methodology for determining what constitutes "similar" merchandise. See *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

In this review, the ITA compared home market sales of TRBs to U.S. sales according to five physical characteristics criteria, determining a "similar" bearing by computing a single factor, the "sum of the deviations," which is based on differences between the U.S. and home market bearings. With respect to each, ITA compared the variable cost of the "similar" home market bearing to that of the U.S. model. If the difference was greater than 20%, the ITA did not consider the pair to be "similar." If not, this cost difference was used to calculate an adjustment pursuant to 19 C.F.R. § 353.57(b) (1992). *Final Results*, 57 Fed.Reg. at 4,952.

■ An accurate investigation requires that the merchandise used in the comparison be as similar as possible. Furthermore, as plaintiffs correctly maintain, there is a statutory preference for comparison of most similar, if not identical merchandise for the purpose of FMV calculations. 19 U.S.C. § 1677(16); *see Timken Co. v. United States* ("*Timken I*"), 10 CIT 86, 96, 630 F.Supp. 1327, 1336 (1986). Undoubtedly, the ITA's fundamental objective in an antidumping investigation is to compare the United States price of imported merchandise with the value of "such or similar merchandise" sold in the foreign market. *Timken I*, 10 CIT at 95, 630 F.Supp. at 1336.

This Court recently ruled on this issue in *Koyo Seiko Co. v. United States*, 17 CIT ——, ——, 834 F.Supp. 431, 434–35 (1993) stating that Commerce's methodology "must be used in conjunction with the ten percent cap to limit the permissible deviation of the criteria used to make TRB models." *Id.* at ——, 834 F.Supp. at 435. The use of a ten percent cap avoids comparisons between products which differ so dramatically that they simply cannot be considered commercially similar. *Id.* More recently, this Court adhered to this decision in *NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. v. United States*, 17 CIT ——, ——, 835 F.Supp. 646, 648 (1993).

The Court adheres to its earlier decision and, therefore, this case is remanded to Commerce to impose a 10% limit upon deviation from the five-criterion model match methodology used in the final results for selecting the most similar home market TRB model.

### 2. *Splitting TRB Sets to Calculate FMV*

■ NTN argues that splitting of TRB sets into cups and cones is contrary to statute in that it results in the use of fictitious sales and fictitious markets (in order to create fictitious prices) for purposes of establishing foreign market value. *Plaintiffs' Brief* at 22.

Commerce maintains that the set-splitting methodology is used to apportion the price of a set to its component parts based on a ratio of the cost of production of each part to the cost of production of the set. Commerce asserts that at no time do they create a fictitious sale: they only allot portions of the price of actual sales to their component parts. *Defendants' Brief* at 28–33.

NTN argues that the establishment of foreign market value by the agency is subject to clearly defined guidelines in the statute: "... In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account." 19 U.S.C. § 1677b(a)(1) (1988).

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

NTN contends that 19 U.S.C. § 1677b(a)(1) and 19 C.F.R. § 353.43(b) (1992) do not permit the creation of fictitious, "pretended" sales for purposes of calculating foreign market value. *Plaintiffs' Brief* at 22–23. NTN's argument has been previously rejected by this Court in *Timken Co. v. United States* ("*Timken II*"), 11 CIT 786, 794, 673 F.Supp. 495, 504 (1987); *see also NTN Bearing Corp. of America v. United States*, 14 CIT 623, 639–40, 747 F.Supp. 726, 740 (1990). NTN states that it believes that the decision of the Court in *Timken II* as to set splitting is erroneous because the Court failed to consider the statutory scheme for the determination of whether merchandise is being sold in the U.S. at less than fair value. *Plaintiffs' Brief* at 32. They argue that the statutory scheme provides that fair value shall be determined in the first instance by reference to home market prices for "such or similar" merchandise. 19 U.S.C. § 1677b(a)(1)(A). If there are not sufficient sales of such or similar merchandise in the home market, the statute directs the administering authority to look to third country prices or constructed value. 19 U.S.C. § 1677b(a)(1)(B) and (2). NTN further states that the decision of the Court in *Timken II* also undermines the fundamental purpose of the antidumping duty law by subjecting importers to arbitrary assessments of antidumping duties. *Plaintiffs' Brief* at 32.

This Court disagrees with NTN's assessment of the statute. Rather than frustrating the purpose of the antidumping law, ITA's set-splitting methodology furthers that purpose by discouraging circumvention. This Court has found that the statutory provision defining foreign market value as the price at which such or similar merchandise is sold (19 U.S.C. § 1677b(a)(1)(A)) cannot be interpreted so as to exclude set splitting because such an interpretation "would clearly facilitate, if not promote, the circumvention of the dumping laws." *NTN Bearing Corp.*, 14 CIT at 640, 747 F.Supp. at 741.

As this Court stated in *Timken II*, NTN is incorrect in asserting that by splitting sets the ITA used "pretended" sales to determine foreign market value. *Timken II*, 11 CIT at 794, 673 F.Supp. at 504. The sales of the cups and cones in the home market were not pretended: they were legitimate sales to legitimate customers that actually took place.

Nor can section 1677b(a)(1)(B) reasonably be interpreted as preventing the ITA from determining prices of home market merchandise whenever that merchandise was sold together with other merchandise for a single price. That section is intended to prevent foreign manufacturers from using misleading invoices or other practices to circumvent the antidumping law. See H.F.Conf.Rep. No. 79, 67th Cong., 1st Sess. 11 (1921) (stating that the purpose of the section is to prevent the establishment of a fictitious market value by other than bona fide sales). The ITA's methodology of splitting sets not only discourages such circumvention, it does not permit it. In the absence of the agency's practice of splitting sets and determining prices based on relative production costs, NTN could have compelled the use of constructed value simply by selling sets in one market and single cups and cones in the other. *See Certain Electric Motors from Japan; Final Results of Administrative Review of Antidumping Duty Order*, 49 Fed.Reg. 32,627, 32,628–29 (Aug. 15, 1984) (ITA chose system sales as the basis for comparison to prevent the possibility of disguised margins). The Court therefore affirms the ITA's action and declines to read section 1677b(a)(1) to permit such control by foreign manufacturers of the manner which foreign market value is determined.

### 3. *Sales Across Different Levels of Trade*

■ NTN argues that Commerce erred in comparing U.S. TRB models with home market TRB models sold at different levels of trade and that the Court should reject Commerce's methodology. *Plaintiffs' Brief* at 34–39. For the reasons set out below, NTN's argument is meritless.

19 U.S.C. § 1675(a) (1988) requires Commerce to calculate the difference between foreign market value and United States price ("USP") of the imported merchandise. Before calculating FMV, Commerce must first identify for each U.S. sale a comparison home market sale. If identical merchandise as defined in 19 U.S.C. § 1677(16) is not

available, Commerce must then proceed to select similar merchandise as defined in subsections (B) or (C) of 19 U.S.C. § 1677(16).

This Court on several occasions has affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. See *NTN Bearing Corp.*, 14 CIT at 634, 747 F.Supp. at 736; *Timken II*, 11 CIT at 793, 673 F.Supp. at 504; *Koyo Seiko Co. v. United States*, 16 CIT ——, ——, 796 F.Supp. 1526, 1532 (1992). Furthermore, this Court refused to recognize a "level of trade" argument similar to NTN's in *NTN Bearing Corp.*, 14 CIT at 634, 747 F.Supp. at 736, stating:

> With respect to plaintiffs' contention that the ITA's disregard of levels of trade differences is contrary to law, plaintiffs have not provided, nor has the court uncovered any support for this argument. To the contrary, this court has noted previously that there is no statutory mandate requiring Commerce to remain within the same levels of trade while effecting its "such or similar merchandise" determination. [Citation omitted.] Plaintiffs, therefore, have no basis for requesting that the Court require Commerce to limit its comparisons by the level of trade in which the sales occur.

Thus, Commerce's comparison of sales across different levels of trade was in accordance with law and this issue is affirmed as to that comparison methodology.

NTN further argues that a level of trade adjustment based on indirect selling expenses does not reflect the substantial price differences between the two levels of trade and, therefore, any adjustments for level of trade differences should not be limited to only differences in selling expenses, but also account for the full differences in price levels. *Plaintiffs' Brief* at 39–51. Because Commerce did not address the adjustment issue in the *Final Results*, this matter is remanded to Commerce so that it may make an appropriate explanation for the limitation of the level of trade adjustment to NTN's indirect selling expenses.

### 4. *Extended Period of Time Test*

■ It is the contention of NTN that three or more months during a period of review did not represent "an extended period of time" for sales made below the cost of production, but that an extended period must be defined as a majority of the period, or in excess of 50% of the period. *Plaintiffs' Brief* at 51–53.

Commerce disagrees, arguing that 19 U.S.C. § 1677b(b) (1988) is designed to ensure that below-cost sales are not disregarded if these sales occurred over a short period of time or resulted from normal business practices, such as selling obsolete or end-of-year merchandise at below-cost prices. *Final Results*, 57 Fed.Reg. at 4,958.

Commerce explains:

> TRBs are a commodity item that do not demonstrate perishability, seasonality, or frequent generational changes in models. No information on the record in this case indicates that below-cost sales are a normal practice or characteristic in the industry. We used the period of three months to define an extended period of time since three months is commonly used to measure corporate, financial, and economic performance. Use of three months to measure frequency of below-cost sales shows that sales below the cost of production are not random, accidental, or sporadic. This time measurement also ensures that the Department uses home market prices that are above the cost of production in its price-to-price comparisons in all but random or sporadic situations. Therefore, we have determined below-cost sales occurring in three or more months of the review period to have been made over an extended period of time. (*See Final Results of Antidumping Duty Administrative Review, Tapered Roller Bearings, Four Inches or Less in Outside Diameter and Certain Components Thereof, from Japan*, 56 Fed.Reg. 65,228 (Dec. 16, 1991)).

*Id.*

NTN argues that the "extended period of time" for purposes of 19 U.S.C. § 1677b(b)(1) should be over half of the 12–month review period or six months. Its entire argument is

based on the dictionary definition of extended time. *See Plaintiffs' Brief* at 51–53.

Congress did not provide a specified time period in section 1677b(b) for determining whether sales below cost were made over an extended period of time and therefore has left it up to Commerce to determine what constitutes an extended period of time within the context of a particular proceeding. If Commerce's interpretation is reasonable, it must be sustained. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

NTN produced no information indicating that below-cost sales are a normal and expected characteristic of the trade in TRBs. Therefore, Commerce's definition of the term "extended period of time" is supported by substantial evidence and in accordance with law and this issue is hereby affirmed.

### 5. Calculation of NTN's Credit Costs

■ NTN argues that, in calculating credit costs, Commerce should take into account any compensating balances that NTN had deposited. NTN further argues that Commerce should have calculated the credit costs using NTN's preferred formula. *Plaintiffs' Brief* at 53–57. Commerce states that although NTN has not demonstrated that Commerce's formula for calculating credit expenses is in any way unreasonable, the matter should be remanded so that Commerce can accurately explain its methodology. *Defendants' Brief* at 42–43. Because in the final results Commerce did not accurately explain the manner in which it calculated the deposit rate and the reasons for not using NTN's nominal interest, this issue is remanded to Commerce so that it can explain the methodology that it employed in calculating credit costs.

### 6. Home Market Sales Not in the Ordinary Course of Trade

■ Commerce stated that, due to the significant number of home market sales transactions, it was satisfied that the results of the review were not meaningfully affected by the exclusion of sample sales and sales NTN had identified as not in the "ordinary course of trade." *Final Results,* 57 Fed.Reg. at 4,959.

NTN asserts that there was an inadvertent computer error on the part of the ITA given the ITA's determination in the final results not to use these sales. NTN also notes that the exclusion of such sales not in the ordinary course of trade is consistent with the ITA's practice in the original investigation and the final results issued in the 1987–88 review in this case as well as in the 1989–90 review of this case and requests that this issue be remanded to the ITA to correct this error. *Plaintiffs' Brief* at 57–58.

Commerce agrees and requests that this issue be remanded for reconsideration because of the discrepancy between the statement contained in the final results and the action actually taken (inclusion of all sales in the margin analysis). *Defendants' Brief* at 43. Therefore, this matter is remanded to the ITA for reconsideration.

### 7. Use of Above–Cost Sales for Calculating Foreign Market Value

NTN argues that Commerce improperly used sales in insufficient quantities contrary to 19 U.S.C. § 1677b(b) in determining foreign market value. *Plaintiffs' Brief* at 58–60. Because NTN raises this issue for the first time and Commerce did not have an opportunity to address it in the final results, this matter is remanded to Commerce so that it can comment upon it.

### 8. Treatment of Home Market Discounts for COP Test

NTN notes that while the analysis memorandum suggests that discounts were deducted from home market price before conducting the below-cost of production sales test pursuant to 19 U.S.C. § 1677b(b), the computer program indicates that no discounts were actually deducted. *Plaintiffs' Brief* at 61–62. Commerce agrees that the matter should be remanded. *Defendants' Brief* at 44. Therefore, this issue is remanded to Commerce for reconsideration.

### 9. Computer Program Errors

NTN notes that computer programming errors resulted in the exclusion of certain home market sales and in an improper merging of home market sales data with U.S. sales data base. *Plaintiffs' Brief* at 62–65. Commerce agrees that this case should be remanded, *Defendants' Brief* at 44, and this issue is hereby remanded to Commerce for correction of the computer programming errors.

### 10. Failure to Issue Amended Final Results

■ NTN argues that Commerce erred in its failure to issue amended final results after NTN submitted comments regarding alleged ministerial errors. *Plaintiffs' Brief* at 65–66. Commerce requests this Court to remand this issue for correction of any computer errors. *Defendants' Brief* at 45. Since suits contesting the final results were filed before comments were submitted by NTN, Commerce could not amend the final results without leave of this Court. *See Zenith Elecs. Corp. v. United States*, 884 F.2d 556, 561 (Fed.Cir.1989). Therefore, this Court remands this issue for correction of any computer errors.

### Conclusion

For the foregoing reasons, this case is remanded to Commerce for (1) application of a 10% limit upon deviation from the five-criterion model match methodology used in the final results; (2) explanation of its reasons for not granting NTN's claim for adjustment for different levels of trade; (3) explanation of its reasons for not accepting NTN's method for calculation of credit expenses and not using NTN's nominal interest rate; (4) reconsideration of NTN's claim that certain home market sales were not in the ordinary course of trade and therefore should be excluded from the calculation of foreign market value; (5) reconsideration of whether discounts should be deducted from home market sales prices for purposes of the below-cost of production sales test; (6) comments upon the question whether the above-cost home market TRB sales were adequate for calculating foreign market value; (7) correction of computer programming instructions (a) to preclude the exclusion of certain home market sales for calculation of foreign market value, and (b) to properly merge home sales data base with U.S. sales data base. Commerce's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.