NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Mfg. Corporation and NTN Corporation, Plaintiffs,

v.

UNITED STATES, United States Department of Commerce, and Ronald H. Brown, Secretary of Commerce, Defendants,

The Timken Company, Defendant–Intervenor.

Slip Op. 94–200.
Court No. 92–03–00168.

United States Court of
International Trade.

Dec. 29, 1994.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger and Jesse M. Gerson, Chicago, IL, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, Washington, DC (Linda S. Chang and Joan L. MacKenzie, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Julie Chasen Ross and Edith A. Eisner, Washington, DC, for defendant-intervenor.

### *OPINION*

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Mfg. Corporation and NTN Corporation ("NTN"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("ITA" or "Commerce") final results of its third administrative review of certain tapered roller bearings ("TRBs") from Japan. *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,960 (Feb. 11, 1992), as amended by *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Amendment to Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 9,104 (Mar. 16, 1992), (collectively, *"Final Results "*).

Specifically, plaintiffs claim that the ITA erred in (1) its refusal to employ a 10% maximum deviation limit on any single physical criterion employed by the ITA in their "sum of the deviation" methodology, which is used to determine similar merchandise sold in the home market; (2) basing foreign market value ("FMV") of TRB cups and cones sold in the United States upon prices created by splitting the price of sets sold in the home market; (3) matching U.S. sales with home market sales at different levels of trade when no sales of such or similar merchandise at the same level of trade were found in the home market; (4) its refusal to make a level of trade adjustment which would reflect the full differences in price levels between different levels of trade; (5) its refusal to use a period of six months, which represents a majority of the period of review, for purposes of the "extended period of time test" employed by the ITA as part of its test to exclude home market sales made at prices below cost of production ("COP"); (6) its refusal to use the interest rate reported by NTN, which rate took compensating deposits into account, for purposes of calculating credit expenses in Japan; (7) its use of certain home market sales to determine foreign market value which were inadequate to form a basis of foreign market value pursuant to 19 U.S.C. § 1677b(b) (1988); (8) its comparison of bearings of different design types; and (9) its commission of two clerical errors: namely, its failure to deduct discounts from home market price for purposes of the cost of production test and its failure to identify all possible identical or similar models sold in the home market. *Plaintiffs' Motion and Memorandum in Support Thereof for Judgment on the Agency Record ("Plaintiffs' Brief")* at 13–64.

### Background

In 1976, the Treasury published a dumping finding, T.D. 76–227, with respect to TRBs from Japan. *Tapered Roller Bearings and Certain Components Thereof From Japan,* 41 Fed.Reg. 34,974 (Aug. 18, 1976). In 1981, Commerce clarified T.D. 76–227 to cover only TRBs four inches or less in outside diameter, and certain TRB components. *Tapered Roller Bearings and Certain Components There-*of *From Japan; Clarification of Scope of Antidumping Finding,* 46 Fed.Reg. 40,550 (Aug. 10, 1981). In 1982, Commerce revoked T.D. 76–227 with respect to TRBs manufactured by NTN. *Defendants' Memorandum in Partial Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendants' Brief")* at 4.

In 1987, Commerce published another antidumping duty order on TRBs from Japan. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 37,352 (Oct. 6, 1987). This order included all TRBs and parts thereof manufactured by NTN and all TRBs over four inches in outside diameter and parts thereof manufactured by other manufacturers.

In August 1991, Commerce published its final results of its first administrative review of TRBs covered by the 1987 order. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 41,508 (Aug. 21, 1991). These final results have been contested by Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo") (Court No. 91–09–00704), NTN (Court No. 91–09–00695), and The Timken Company ("Timken") (Court No. 91–09–00697).

In February 1992, Commerce published the final results of its second administrative review of TRBs covered by the 1987 order. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,951 (Feb. 11, 1992), covering the period October 1, 1988 through September 30, 1989. These final results have been contested by Timken (Court No. 92–03–00162), NTN (Court No. 92–03–00167), Koyo (Court No. 92–03–00169), and NSK (Court No. 92–03–00158).

In February of 1992, Commerce published the final results of the third administrative review of TRBs covered by the 1987 order, covering the period October 1, 1989 through September 30, 1990. *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Final Results of An-*

*tidumping Duty Administrative Review,* 57 Fed.Reg. 4,960 (Feb. 11, 1992). These final results have been contested by Koyo (Court No. 92–03–00156), Timken (Court No. 92–03–00161) and, in the present case, NTN (Court No. 92–03–00168).

In March of 1992, Commerce published an amendment to the final results for the third administrative review of TRBs covered by the 1987 order. *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Amendment to Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 9,104 (Mar. 16, 1992). These amended final results have been contested by Timken (Court No. 92–03–00161) and NTN (Court Nos. 92–03–00168 and 92–04–00257).

## Discussion

■ This Court must uphold final results of an ITA administrative review unless the ITA determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed Cir.1990).

### 1. Model Match Methodology

■ NTN argues that, for purposes of calculating dumping margins, Commerce compared dissimilar merchandise because it did not impose a ten percent limit upon deviation from the five-criteria model match methodology for selecting the most similar home market TRB model. It is NTN's position that it is unlawful and unreasonable to compare, on any basis, bearings that are radically different as to any one of the five physical criteria, and not to have placed an individual cap on each of the five criteria used. Thus, the 20% cost cap used does not ensure the physical similarity of bearings or comparable commercial value. *Plaintiffs' Brief* at 13–21.

The ITA asserts that when identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select "similar" comparison merchandise based upon the physical characteristics of the merchandise being compared. *Defendants' Brief* at 9–10; 19 U.S.C. § 1677(16) (1988).[1] Commerce has been granted broad discretion to devise a methodology for determining what constitutes "similar" merchandise. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

In this review, the ITA compared home market sales of TRBs to U.S. sales according to five physical characteristics criteria, determining a "similar" bearing by computing a single factor, the "sum of the deviations," which is based on differences between the

---

**1.** 19 U.S.C. § 1677(16) (1988) provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purpose of part II of this subtitle can be satisfactorily made:

**(A)** The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

**(B)** Merchandise—

**(i)** produced in the same country and by the same person as the merchandise which is the subject of the investigation,

**(ii)** like that merchandise in component material or materials and in the purposes for which used, and

**(iii)** approximately equal in commercial value to that merchandise.

**(C)** Merchandise—

**(i)** produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

**(ii)** like that merchandise in the purposes for which used, and

**(iii)** which the administering authority determines may reasonably be compared with that merchandise.

U.S. and home market bearings. With respect to each, ITA compared the variable cost of the "similar" home market bearing to that of the U.S. model. If the difference was greater than 20%, the ITA did not consider the pair to be "similar." If not, this cost difference was used to calculate an adjustment pursuant to 19 C.F.R. § 353.57(b) (1992). Commerce argues its actions are in accordance with law and well within the discretion it is granted as the merchandise selected had the same physical characteristics and was approximately equal in commercial value. *Defendants' Brief* at 10–28. Timken echoes the arguments made by Commerce. *The Timken Company's Response to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record ("Timken's Brief")* at 15–24.

■ An accurate investigation requires that the merchandise used in the comparison be as similar as possible. Furthermore, as plaintiffs correctly maintain, there is a statutory preference for comparison of most similar, if not identical merchandise for the purpose of FMV calculations. 19 U.S.C. § 1677(16); *see Timken Co. v. United States ("Timken I")*, 10 CIT 86, 96, 630 F.Supp. 1327, 1336 (1986). Undoubtedly, the ITA's fundamental objective in an antidumping investigation is to compare the United States price of imported merchandise with the value of "such or similar merchandise" sold in the foreign market. *Timken I*, 10 CIT at 95, 630 F.Supp. at 1336.

This Court recently ruled on this issue in *Koyo Seiko Co. v. United States*, 17 CIT ——, ——, 834 F.Supp. 431, 434–35 (1993) stating that Commerce's methodology "must be used in conjunction with the ten percent cap to limit the permissible deviation of the criteria used to make TRB models." *Id.* at ——, 834 F.Supp. at 435. The use of a ten percent cap avoids comparisons between products which differ so dramatically that they simply cannot be considered commercially similar. *Id.* More recently, this Court adhered to this decision in *NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. v. United States*, 17 CIT ——, ——, 835 F.Supp. 646, 648 (1993), *appeal after remand, dismissed*, 18 CIT ——, 843 F.Supp. 737 (1994), and in

*NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. v. United States*, 18 CIT ——, 858 F.Supp. 215 (1994).

The Court adheres to its earlier decision and, therefore, this case is remanded to Commerce to impose a 10% limit upon deviation from the five-criterion model match methodology used in the final results for selecting the most similar home market TRB model.

### 2. *Splitting TRB Sets to Calculate FMV*

■ NTN argues that splitting of TRB sets into cups and cones is contrary to statute in that it results in the use of fictitious sales and fictitious markets (in order to create fictitious prices) for purposes of establishing foreign market value. NTN further argues that Commerce's artificial price methodology frustrates the purpose of the antidumping statute because it divests the exporter of control over its home market prices. Thus, NTN argues it may be subjected to arbitrary assessments of antidumping duties because it has no control over the relative prices of its merchandise as determined by Commerce. *Plaintiffs' Brief* at 21–34.

Commerce maintains that the set-splitting methodology is used to apportion the price of a set to its component parts based on a ratio of the COP of each part to the COP of the set. Commerce asserts that they do not create a fictitious sale: they only allot portions of the price of actual sales to their component parts. *Defendants' Brief* at 29–34. Timken supports Commerce's position. *Timken's Brief* at 29–38.

NTN argues that the establishment of foreign market value by the agency is subject to clearly defined guidelines in the statute: "In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account." 19 U.S.C. § 1677b(a)(1) (1988); *Plaintiffs' Brief* at 21–22.

NTN argues that 19 U.S.C. § 1677b(a)(1) and 19 C.F.R. § 353.43(b) (1992) do not permit the creation of fictitious, "pretended"

sales for purposes of calculating foreign market value. *Plaintiffs' Brief* at 21–23.

NTN's argument has been previously rejected by this Court in *Timken Co. v. United States ("Timken II")*, 11 CIT 786, 794, 673 F.Supp. 495, 504 (1987); *see also NTN Bearing Corp. of America v. United States*, 14 CIT 623, 639–40, 747 F.Supp. 726, 740 (1990). NTN states that it believes that the decision of the Court in *Timken II* as to set splitting is erroneous because the Court failed to consider the statutory scheme for the determination of whether merchandise is being sold in the U.S. at less than fair value. *Plaintiffs' Brief* at 32. They argue that the statutory scheme provides that fair value shall be determined in the first instance by reference to home market prices for "such or similar" merchandise. 19 U.S.C. § 1677b(a)(1)(A). If there are not sufficient sales of such or similar merchandise in the home market, the statute directs the administering authority to look to third country prices or constructed value. 19 U.S.C. § 1677b(a)(1)(B) and (2). NTN further states that the decision of the Court in *Timken II* also undermines the fundamental purpose of the antidumping duty law by subjecting importers to arbitrary assessments of antidumping duties. *Id.* at 32.

This Court disagrees with NTN's assessment of the statute. Rather than frustrating the purpose of the antidumping law, ITA's set-splitting methodology furthers that purpose by discouraging circumvention. This Court has found that the statutory provision defining foreign market value as the price at which such or similar merchandise is sold (19 U.S.C. § 1677b(a)(1)(A)) cannot be interpreted so as to exclude set splitting because such an interpretation "would clearly facilitate, if not promote, the circumvention of the dumping laws." *NTN Bearing Corp.*, 14 CIT at 640, 747 F.Supp. at 741.

As this Court stated in *Timken II*, NTN is incorrect in asserting that by splitting sets the ITA used "pretended" sales to determine foreign market value. *Timken II*, 11 CIT at 794, 673 F.Supp. at 504. The sales of the cups and cones in the home market were not pretended: they were legitimate sales to legitimate customers that actually took place.

Nor can section 1677b(a)(1)(B) reasonably be interpreted as preventing the ITA from determining prices of home market merchandise whenever that merchandise was sold together with other merchandise for a single price. That section is intended to prevent foreign manufacturers from using misleading invoices or other practices to circumvent the antidumping law. See H.R.Conf.Rep. No. 79, 67th Cong., 1st Sess. 11 (1921) (stating that the purpose of the section is to prevent the establishment of a fictitious market value by other than bona fide sales). The ITA's methodology of splitting sets not only discourages such circumvention, it does not permit it. In the absence of the agency's practice of splitting sets and determining prices based on relative production costs, NTN could have compelled the use of constructed value simply by selling sets in one market and single cups and cones in the other. *See Certain Electric Motors from Japan; Final Results of Administrative Review of Antidumping Duty Order*, 49 Fed.Reg. 32, 627, 32,628–29 (Aug. 15, 1984) (ITA chose system sales as the basis for comparison to prevent the possibility of disguised margins).

The Court therefore affirms the ITA's action and declines to read section 1677b(a)(1) to permit such control by foreign manufacturers of the manner which foreign market value is determined.

### 3. *Sales Across Different Levels of Trade*

■ NTN argues that Commerce erred in comparing U.S. TRB models with home market TRB models sold at different levels of trade and that the Court should reject Commerce's methodology. *Plaintiffs' Brief* at 34–39. For the reasons set out below, NTN's argument is without merit.

19 U.S.C. § 1675(a) (1988) requires Commerce to calculate the difference between foreign market value and United States price ("USP") of the imported merchandise. Before calculating FMV, Commerce must first identify, for each U.S. sale, a comparison home market sale. If identical merchandise as defined in 19 U.S.C. § 1677(16) is not available, Commerce must then proceed to

select similar merchandise as defined in subsections (B) or (C) of 19 U.S.C. § 1677(16).

During the review, for purposes of comparing U.S. TRB models with home market TRB models, Commerce first searched for such or similar merchandise at the same level of trade and then at different levels of trade, making adjustments for differences using NTN's indirect selling expenses. *Defendants' Brief* at 34.

This Court on several occasions has affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. *See NTN Bearing Corp.*, 14 CIT at 634, 747 F.Supp. at 736; *Timken II*, 11 CIT at 793, 673 F.Supp. at 504; *Koyo Seiko Co. v. United States*, 16 CIT 539, ——, 796 F.Supp. 1526, 1532 (1992). Furthermore, this Court refused to recognize a "level of trade" argument similar to NTN's in *NTN Bearing Corp.*, 14 CIT at 634, 747 F.Supp. at 736, stating:

> With respect to plaintiffs' contention that the ITA's disregard of levels of trade differences is contrary to law, plaintiffs have not provided, nor has the court uncovered any support for this argument. To the contrary, this court has noted previously that there is no statutory mandate requiring Commerce to remain within the same levels of trade while effecting its "such or similar merchandise" determination. [Citation omitted.] Plaintiffs, therefore, have no basis for requesting that the Court require Commerce to limit its comparisons by the level of trade in which the sales occur.

Therefore, Commerce's comparison of sales across different levels of trade was in accordance with law and this issue is affirmed as to that comparison methodology.

### 4. *Level of Trade Adjustment*

■ NTN alternatively claims that, if Commerce is to cross trade levels when selecting such or similar merchandise, a level of trade adjustment based on indirect selling expenses does not reflect the substantial price differences between the two levels of trade and, therefore, any adjustments for level of trade differences should not be limit-

ed to only differences in selling expenses, but also account for the full differences in price levels. *Plaintiffs' Brief* at 39–51.

NTN argues such an adjustment should be made pursuant to 19 C.F.R. § 353.58 (1992), which states in relevant part:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and *make appropriate adjustments for differences affecting price comparability.*

(Emphasis added.)

Accordingly, NTN now asks the Court to remand this case to Commerce for a level of trade adjustment accounting for differences in indirect selling expenses as well as "price comparability" and for an explanation as to why NTN has not adequately demonstrated that the difference in price among the levels of trade is due to the differences in levels of trade. *Plaintiffs' Brief* at 39–42.

In the present case, however, Commerce explained to the satisfaction of this Court its rejection of NTN's claim for a level of trade adjustment based on price:

> NTN's argument that a level of trade adjustment should be based on the differences in price levels does not address the issue of whether the difference in price is solely due to the difference in level of trade, or whether other factors affect price. NTN submitted quantifiable evidence which reflects the difference in selling expenses, but because we have already made adjustments for the direct selling expenses, we have based our adjustment on indirect selling expenses only in order to avoid double counting the direct selling expenses [citation omitted].

*Final Results*, 57 Fed.Reg. at 4,966.

Thus, Commerce concluded that the only quantifiable information submitted by plain-

tiffs that accounts for the difference in price across levels of trade is selling expenses and, since direct selling expenses were already deducted, Commerce found that a deduction of indirect selling expenses was the only basis for a level of trade adjustment. *Id.; see also NTN Bearing Corp.,* 17 CIT at ——, 835 F.Supp. at 650. The Court agrees and finds that Commerce acted reasonably and hereby affirms its decision on this issue.

### 5. *Extended Period of Time Test*

■ Commerce used a period of three months to define "an extended period of time" for purposes of testing whether to include certain below cost sales in its calculation of FMV. It is the contention of NTN that three months during a period of review did not represent "an extended period of time" for sales made below the cost of production, but that an extended period must be defined as a majority of the period, or in excess of 50% of the period. *Plaintiffs' Brief* at 51–52.

Commerce disagrees, arguing that 19 U.S.C. § 1677b(b) is designed to ensure that below-cost sales are disregarded only if they are seasonal or short-term sales. Commerce points out that TRBs are not perishable or subject to seasonal fluctuations and do not undergo frequent generational changes. *Defendants' Brief* at 40–43. Timken agrees with the arguments presented by Commerce. *Timken's Brief* at 55–56.

Commerce defined an "extended period of time" as three months and explains:

> We used a period of three months to define extended period of time since three months is commonly used to measure corporate, financial, and economic performance. The use of three months to measure frequency of below-cost sales shows that sales below COP are not random, accidental, or sporadic. This time measurement also ensures that the Department uses home market prices that are above COP in its price to price comparisons in all but random or sporadic situations.

*Final Results,* 57 Fed.Reg. at 4,965.

NTN argues that the "extended period of time" should be over half of the 12–month review period or six months. Its entire argument is based on the dictionary definition of extended time. *See Plaintiffs' Brief* at 51–52.

Congress did not provide a specified time period in section 1677b(b) for determining whether sales below cost were made over an extended period of time and therefore has left it up to Commerce to determine what constitutes an extended period of time within the context of a particular proceeding. If Commerce's interpretation is reasonable, it must be sustained. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

NTN produced no information indicating that below-cost sales are a normal and expected characteristic of the trade in TRBs. Thus, Commerce's definition of the term "extended period of time" is supported by substantial evidence and in accordance with law. Further, this Court has previously determined, under similar circumstances, that three months does constitute "an extended period of time." *See NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. v. United States,* 18 CIT ——, 858 F.Supp. 215 (1994). Therefore, this issue is hereby affirmed.

### 6. *Calculation of NTN's Credit Costs*

NTN argues that, in calculating credit costs, Commerce should take into account any compensating balances that NTN had deposited. NTN asserts it is only fair that Commerce consider these funds as part of the interest expense because NTN must keep the funds tied up on deposit for purposes of a loan. NTN asserts that this expense is based on NTN's audited books and records and that, therefore, there is no basis for the ITA to reject it. Alternatively, NTN urges that, if the ITA disallows NTN's claim as to compensating deposits, the ITA should use NTN's nominal interest rate. *Plaintiffs' Brief* at 52–56.

Timken argues that NTN's interest rate for calculating credit costs should be recalculated without any adjustment for compensating deposits because NTN did not demonstrate that the deposits were required by its bankers with respect to particular commer-

cial loans or were in any way linked to its loans. *Timken's Brief* at 38–40. In the review, Commerce agreed with Timken, stating:

> We agree with Timken that there is inadequate justification to accept NTN's credit cost calculation based on compensating deposits. In our preliminary results, we recalculated NTN's credit costs based on the firm's net interest expense (disregarding compensating deposits) as most representative of the firm's internal cost of funds.

*Final Results,* 57 Fed.Reg. at 4,968.

■ Commerce states that, although NTN has not demonstrated that Commerce's formula for calculating credit expenses is in any way unreasonable, the matter should be remanded so that Commerce can explain its methodology. *Defendants' Brief* at 43–44. Because in the final results Commerce did not adequately explain the manner in which it calculated the deposit rate and the reasons for not using NTN's nominal interest rate, this issue is remanded to Commerce so that it can explain the methodology that it employed in calculating credit costs.

### 7. *Sales Made in Insufficient Quantities*

■ NTN argues that Commerce, after properly disregarding below-cost home market sales, improperly used sales in insufficient quantities in determining foreign market value contrary to 19 U.S.C. § 1677b(b). NTN states that Commerce never determined that the remaining sales were adequate and that Commerce's printouts which were released to NTN did not identify the quantity of each home market model used to determine FMV. Consequently, NTN asserts it cannot provide examples of this alleged error as it has for a previous review. NTN requests a remand ordering Commerce to release the information. *Plaintiffs' Brief* at 56–57.

Commerce asserts that, as NTN has not demonstrated that insufficient quantities of TRB models remained after Commerce disregarded below-cost sales, NTN's complaint should be rejected. Commerce contends it should not be required to supplement the administrative record with currently non-existing compilations. Commerce states that, although it generally uses the quantity of

units sold to calculate FMV, it does not normally examine the quantity of units sold for each model in calculating FMV. *Defendants' Brief* at 44–46. Timken agrees with the ITA's position and adds that there is no requirement in the statute that the ITA use a particular volume of home market sales in calculating FMV. *Timken's Brief* at 57–58.

NTN has not demonstrated that Commerce, in fact, used insufficient quantities of home market sales in determining FMV, and has not cited to any record reference which would indicate that it requested Commerce to create the information which it now seeks. Therefore, this Court finds that Commerce acted in accordance with law and is supported by substantial evidence. This issue is hereby affirmed.

### 8. *Bearing Design Type*

■ NTN contests Commerce's comparison of bearings of different design types. NTN claims that Commerce erroneously compared normal grade bearings with high precision grade bearings. NTN asserts that neither Commerce's model match methodology, the sum of deviations methodology, nor Commerce's cost test, recognize important distinctions between normal grade and high precision grade bearings, which resulted in the comparison of highly dissimilar merchandise. *Plaintiffs' Brief* at 58–60.

At the administrative level, Commerce disagreed with NTN, explaining its model match methodology:

> Throughout the extended history of the two TRB proceedings, the Department requested input by interested parties and evolved the use of these five physical criteria to identify and compare models sold in the U.S. and the home market. We are aware that these five characteristics are not substitutes for the technical specifications of the products under review, since TRB product manual list more than 25 statistics for each bearing. However, we have determined that, for the purposes of selecting similar merchandise in a dumping calculation, these five criteria are the pertinent data to be collected and analyzed.

*Final Results,* 57 Fed.Reg. at 4,964.

In this review, Commerce utilized a five-characteristic model match methodology to

determine such or similar merchandise. The Court has upheld this methodology as reasonable in the past. *NTN Bearing Corp.,* 14 CIT 623, 747 F.Supp. 726. In *NTN Bearing Corp.,* the Court noted that Commerce has "broad discretion in the selection of methodology" and that "absent a showing of unreasonableness," Commerce's choice of methodology should be upheld. *Id.* at 633, 747 F.Supp. at 736. "Such or similar" merchandise is defined in 19 U.S.C. § 1677(16). (*See* footnote 1 for full text.)

It is the party contesting Commerce's methodology which has the burden of demonstrating that Commerce's methodology was unreasonable. *Timken II,* 11 CIT at 792–93, 673 F.Supp. at 503. The Court has deemed merchandise similar despite differences in characteristics or use among the merchandise. *See U.H.F.C. Co. v. United States,* 916 F.2d 689 (Fed.Cir.1990); *United Engineering and Forging v. United States,* 15 CIT 561, 779 F.Supp. 1375 (1991), *aff'd without opinion,* 996 F.2d 1236 (Fed.Cir.1993); *Kerr-McGee Chem. Corp. v. United States,* 14 CIT 422, 741 F.Supp. 947 (1990); *Monsanto Co. v. United States,* 12 CIT 937, 698 F.Supp. 275 (1988).

In this case, while NTN has demonstrated some differences, these differences on the whole do not preclude normal and high precision bearings from being considered "such or similar" merchandise under 19 U.S.C. § 1677(16). *See NSK Ltd. and NSK Corp. v. United States,* 17 CIT ——, Slip Op 93–178, 1993 WL 366968 (Sept. 10, 1993). This Court finds that Commerce acted reasonably in comparing normal grade bearings with high precision grade bearings. Therefore, this issue is hereby affirmed.

### 9. *Clerical Errors*

NTN alleges Commerce committed two clerical errors. First, NTN notes that, although Commerce has deducted discounts from home market price for purposes of the cost of production test in other antidumping proceedings and had confirmed at the disclosure conference that it had done so in this review, the computer program in this case indicates that no discounts were actually deducted. NTN believes this was a clerical error as the practice of deducting home mar-

ket discounts for the purpose of the COP test is consistent with past agency practice and with law. *Plaintiffs' Brief* at 61–62. Commerce disputes that a clerical error occurred, but admits to a discrepancy between its analysis memorandum and the computer program instructions. *Defendants' Brief* at 46. Timken asserts that a remand is not required and disputes the manner in which NTN accounts for discounts. *Timken's Brief* at 60–61. In light of the above, this matter is hereby remanded to Commerce for correction of this discrepancy and of any resulting error in the deduction of discounts from home market price for purposes of the cost of production test.

Second, NTN requests a remand so that Commerce can correct a computer programming error which resulted in a failure to identify all possible identical or similar models sold in the home market. *Plaintiffs' Brief* at 62–63. Commerce agrees that a computer programming error occurred. *Defendants' Brief* at 46. Therefore, this matter is remanded for correction of the computer program so that all such or similar home market TRBs are identified.

### *Conclusion*

For the foregoing reasons, this case is remanded to Commerce for (1) application of a 10% limit upon deviation from the five-criterion model match methodology used in the final results; (2) explanation of its reasons for not accepting plaintiffs' method for calculation of credit expenses and not using plaintiffs' nominal interest rate; (3) correction of any error in the deduction of discounts from home market price for purposes of the cost of production test; and (4) correction of the computer program so that all such or similar home market sales are identified. Commerce's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

### *ORDER*

This case having been duly submitted for decision and the Court, after due delibera-

tion, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("ITA"), for (1) application of a 10% limit upon deviation from the five-criterion model match methodology used in the final results; (2) explanation of its reasons for not accepting plaintiffs' method for calculation of credit expenses and not using plaintiffs' nominal interest rate; (3) correction of any error in the deduction of discounts from home market price for purposes of the cost of production test; and (4) correction of the computer program so that all such or similar home market sales are identified; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

See also, 881 F.Supp. 584.