**NTN BEARING CORP. OF AMERICA, American NTN Bearing Mfg. Corp., and NTN Corporation, Plaintiffs,**

v.

**UNITED STATES, U.S. Department of Commerce and Ronald H. Brown, Secretary, U.S. Department of Commerce, Defendants,**

**The Timken Company, Defendant–Intervenor.**

Slip Op. 96–67.
Court No. 93–12–00793.

United States Court of International Trade.

April 19, 1996.

Barnes, Richardson & Colburn (Donald J. Unger and Jesse M. Gerson), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael S. Kane), Washington, DC; of counsel: Linda Chang, Attorney–Advisor, U.S. Department of Commerce, for defendants.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell and Olufemi A. Areola), Washington, DC, for defendant-intervenor.

## *OPINION*

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of administrative review entitled *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan* ("*Final Results*"), 58 Fed.Reg. 64,720 (1993).

### *Background*

On November 22, 1991, Commerce initiated administrative reviews of tapered roller bearings ("TRBs") from Japan covering the period of 1990 to 1991. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 58,878 (1991). On November 27, 1992, Commerce initiated administrative reviews of TRBs imported from Japan during the period of 1991 to 1992. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 57 Fed.Reg. 56,318 (1992). Commerce published the preliminary results of both reviews on September 30, 1993. *See Preliminary Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan*, 58 Fed.Reg. 51,058 (1993).

On December 9, 1993, Commerce published its final determinations concerning these reviews. *See Final Results*, 58 Fed.Reg. at 64,720. NTN commenced this action pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record alleging the

following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) refusing to apply a ten percent cap as part of the sum of the deviations model match methodology; (2) splitting the price of sets sold in the home market for the purpose of determining foreign market value ("FMV") of cups and cones sold individually in the United States; (3) performing the cost of production test after splitting the sets into cups and cones; (4) using individual cups and cones sold as components of sets as comparison models; (5) using best information available ("BIA") to determine variable cost of manufacturing; (6) including zero price sales, sample sales and small quantity sales as home market sales; (7) comparing merchandise sold at different levels of trade; (8) denying a level of trade adjustment; (9) using a three month extended period of time test; (10) using certain sales in determining FMV; and (11) comparing bearings of different design types. Pls.' Mem.Supp.Mot.J. Agency R. at 15–77.

On February 3, 1994, this Court granted plaintiffs' consent motion for a preliminary injunction enjoining Commerce from liquidating entries of TRBs subject to the Final Results at issue during the pendency of this litigation.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or other-wise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. Model Match Methodology

██ NTN argues that Commerce erred in refusing to impose a ten percent limit upon individual bearing deviations as part of its five-criteria model match methodology for selecting the most similar home market TRB model. According to NTN, Commerce is required to employ a ten percent deviation cap as part of its sum of the deviations methodology. Pls.' Mem.Supp.Mot.J. Agency R. at 15–21.

Commerce responds that when identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select the "most similar" merchandise based upon the physical characteristics of the merchandise being compared. Defs.' Opp'n to Pls.' Mot.J. Agency R. at 14; 19 U.S.C. § 1677(16) (1988).[1] In this review, Commerce compared home market sales of TRBs to U.S. sales by devising a "sum of the

---

1. 19 U.S.C. § 1677(16) (1988) provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
(B) Merchandise—
(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.
(C) Merchandise—
(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.

deviations" methodology. Under this approach, Commerce uses five physical characteristics (inner diameter, outer diameter, width, Y factor, and load rating) as criteria for selecting "similar" model matches. Commerce explains that in conjunction with the "sum of the deviations" methodology, it applied a twenty percent cost cap that prevents the matching of United States and home market models whose variable cost of manufacturing differs by more than twenty percent. Commerce argues its actions are within its discretion and in accordance with law. Defs.' Opp'n to Pls.' Mot.J. Agency R. at 12–15.

The Court of Appeals for the Federal Circuit ("CAFC") recently ruled on this issue in *Koyo Seiko Co. v. United States*, 66 F.3d 1204 (Fed.Cir.1995), holding that Commerce's model match methodology, without the ten percent cap, is a permissible approach under 19 U.S.C. § 1677(16). In reaching its conclusion, the CAFC noted that under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), where a statute is silent or ambiguous with respect to a specific issue, the court is limited to determining whether the agency's approach is a permissible construction of the statute. *Koyo*, 66 F.3d at 1209. The CAFC upheld Commerce's construction of the statute stating the following:

> Commerce's interpretation is reasonable because there is no evidence that any one of the five criteria should be decisive in determining whether to match a given U.S. TRB with a home-market TRB. By choosing not to apply the ten percent cap, Commerce in essence weighs each of the five criteria equally, which is plainly reasonable.

*Koyo*, 66 F.3d at 1210.

In light of the decision of the CAFC in *Koyo*, the Court finds that Commerce's model match methodology without the ten percent cap is a reasonable approach and consistent with law.

### 2. Splitting TRB Sets to Calculate FMV

■ For these Final Results, Commerce decided to split sales of TRB sets in the home market into sales of individual cups and cones for the purpose of establishing FMV. 58 Fed.Reg. at 64,722. NTN argues that Commerce's practice of splitting sets creates fictitious sales and fictitious markets which is contrary to the statutory framework of antidumping law. Pls.' Mem.Supp.Mot.J. Agency R. at 22–32.

Commerce responds that the splitting of TRB sets did not create fictitious prices because Commerce used actual prices based upon actual sales in the home market. Commerce argues that "[b]y 'splitting' TRB sets into TRB components, Commerce obtained sufficiently large 'pools' of potentially comparable cups and cones in order to implement the congressional preference for using prices rather than constructed value in determining foreign market value." Defs.' Opp'n to Pls.' Mot.J. Agency R. at 15. According to Commerce, its methodology is reasonable and consistent with the statute. *Id.* at 15–24.

This Court has already upheld Commerce's practice of splitting sets to calculate FMV. *NTN Bearing Corp. of Am. v. United States* ("*NTN I*"), 18 CIT ——, ——, 881 F.Supp. 584, 590 (1994). Specifically, this Court found that "[r]ather than frustrating the purpose of the antidumping law, ITA's set-splitting methodology furthers that purpose by discouraging circumvention." *Id.* NTN has not presented any new arguments persuading the Court to reconsider its position. Accordingly, the Court sustains Commerce on this issue.

### 3. Inclusion of Split Cups and Cones in the Cost of Production Test

■ In the review at issue, Commerce performed its cost of production test after splitting cups and cones. *Final Results*, 58 Fed.Reg. at 64,729. NTN contends that if splitting is a permissible practice, the cost of production test should occur before as opposed to after the splitting. Pls.' Mem.Supp. Mot.J. Agency R. at 39–44. According to NTN, the cost of production is based on sets and not on individual cups and cones. NTN also asserts that performing the cost of production test after splitting is inconsistent with 19 U.S.C. § 1677b(b) (1988) which au-

thorizes Commerce to apply the cost of production test to "prices" rather than "values" derived from splitting. Pls.' Mem.Supp. Mot.J. Agency R. at 40.

In rebuttal, Commerce explains that it is able to determine accurately the cost of production of individual cups and cones based on the cost of production of sets because the data submitted by NTN establishes the portion of the cost of production of each set allocable to the individual cup and/or cone. Defs.' Opp'n to Pls.' Mot.J. Agency R. at 29–30. Commerce explained this methodology in the Final Results as follows:

> The COP [cost of production] figures we derive from set-splitting when we split prior to conducting the cost test are based on the variable cost of the cup to the cost of the set and the variable cost of the cone to the cost of the set. These ratios are based on costs NTN actually incurred in producing the individual cups and cones. Therefore, the resulting COP figures are not fictional.

58 Fed.Reg. at 64,729.

In *Timken Co. v. United States*, 18 CIT ——, ——, 862 F.Supp. 413, 421 (1994), *aff'd*, 74 F.3d 1260 (Fed.Cir.1996), this Court ordered Commerce to perform the cost of production test after splitting sets of cups and cones. In accordance with the remand order, Commerce performed the cost of production test after splitting the TRB sets and the Court affirmed the results of the remand determination. *Timken Co. v. United States*, 19 CIT ——, Slip Op. 95–20, 1995 WL 57726 (Feb. 10, 1995). Accordingly, the Court upholds Commerce's practice of performing the cost of production test after splitting the sets as consistent with law.

### 4. *Splitting of All Sets*

■ NTN contends that Commerce attempted to split certain TRB models that cannot be split. The models at issue are: TRB units, TRB double row models, TRB thrust bearings, TRB flanged bearings, and TRB high precision models. Pls.' Mem. Supp.Mot.J. Agency R. at 45. According to NTN, TRB models that NTN never sells individually in any market are "unsplittable." *Id.* at 44–46.

Commerce responds that NTN's argument is the same argument rejected by this Court in *NTN Bearing Corp. of Am. v. United States*, 14 CIT 623, 639–40, 747 F.Supp. 726, 740–41 (1990). Defs.' Opp'n to Pls.' Mot.J. Agency R. at 31. Commerce further contends that its methodology is consistent with 19 U.S.C. § 1677(16) which does not require "such or similar" merchandise to be sold in the same manner as the merchandise under review. *Id.* at 31–32.

In support of Commerce's position, The Timken Company ("Timken"), defendant-intervenor, argues that "similarity" is determined based upon five physical characteristics, and that NTN's assertion that a cup or a cone sold that is always sold in a set can never be similar to a cup or cone sold individually creates an additional matching factor not warranted by the statute. Def.–Int.'s Mem. Opp'n to Pls.' Mot.J. Agency R. at 20–21.

In *NTN I*, 18 CIT at ——, 881 F.Supp. at 590, this Court noted that 19 U.S.C. § 1677b(a)(1)(B) [2] "is intended to prevent for-

---

**2.** Section 1677b(a)(1), United States Code (1988), defines FMV as follows:

The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person—

(A) at which such or similar merchandise is sold or, in the absence of such sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption, or

(B) if not sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the Unites States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States,

increased by, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States.... In the ascertainment of foreign market value

eign manufacturers from using misleading invoices or other practices to circumvent the antidumping law." In upholding Commerce's set-splitting methodology, the Court acknowledged that splitting sets "not only discourages such circumvention, it does not permit it." *Id.* The Court further noted that "[i]n the absence of the agency's practice of splitting sets and determining prices based on relative production costs, NTN could have compelled the use of constructed value simply by selling sets in one market and single cups and cones in another." *Id.* The acceptance of NTN's argument would result in the potential circumvention of the law that set splitting is design to prevent because NTN would be able to manipulate Commerce's determinations by selling TRBs individually rather than in sets. Therefore, the Court affirms Commerce on this issue.

### 5. *Use of Best Information Available*

■ In this review, Commerce resorted to BIA to determine variable cost of manufacture ("VCOM"). *Final Results,* 58 Fed.Reg. at 64,731. To derive a VCOM of the home market model, Commerce reduced the United States VCOM by 20 percent. *Id.*

NTN acknowledges that it did not report the VCOM for certain models, but argues that Commerce's resort to BIA was unwarranted. Pls.' Mem.Supp.Mot.J. Agency R. at 46–47. NTN submits that Commerce's methodology "ensures potential matching of split cups and cones resulting from splits of 'unsplittable' TRB models." *Id.* at 47. According to NTN, Commerce's methodology produces matches without taking into account the physical characteristics of the merchandise involved. *Id.*

Commerce responds that NTN's failure to provide information requested justified its resort to BIA regardless of whether NTN disagreed with Commerce's decision to split certain TRB sets. Defs.' Opp'n to Pls.' Mot.J. Agency R. at 32–33. Commerce also states that because NTN failed to supply information that would allow a more accurate determination, Commerce's derivation of a VCOM by reducing the United States VCOM

by 20 percent is proper. *Id.* at 33–34. Commerce also emphasizes that it has used this approach in past reviews. *Id.* at 33.

Section 1677e(c) of Title 19, United States Code (1988), states that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." In addition, Commerce's regulations instruct the Secretary to use BIA whenever Commerce:

> (1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

> (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1993).

NTN does not dispute that it did not provide Commerce with the VCOM for certain TRBs. NTN cannot justify its failure to supply requested information by arguing that the sets are unsplittable. NTN's assertion is contrary to the principle that "[i]t is Commerce, not the respondent, that determines what information is to be provided for an administrative review." *Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 37, 628 F.Supp. 198, 205 (1986). Further, the Court has already determined that Commerce's decision to split all models was supported by law. *See supra* at 205–206. As such, NTN's decision to withhold information from Commerce justified Commerce's resort to BIA.

■ As for Commerce's choice of BIA, the CAFC has held that because Congress explicitly left a gap for the agency to fill, it is within Commerce's discretion to decide what constitutes best information available in a particular case. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191–92 (Fed.Cir.1993). Therefore, this Court must grant Commerce considerable deference in this area.

for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for

sale intended to establish a fictitious market, shall be taken into account.

■ Granting Commerce the appropriate deference, the Court finds Commerce's choice of BIA to be reasonable and within its discretion. The Court upheld Commerce's approach in an earlier case in the face of a challenge by domestic industry that Commerce should have applied more adverse BIA. *Timken Co. v. United States,* 18 CIT ——, ——, 865 F.Supp. 850, 854 (1994). In light of this prior decision, the Court finds that Commerce's choice of BIA is supported by substantial evidence and in accordance with law.

### 6. *Inclusion of Zero Price Sales, Sample Sales and Small Quantity Sales as Home Market Sales*

■ NTN objects to Commerce's inclusion of zero price sales, sample sales and small quantity sales as home market sales. NTN submits that these sales should have been excluded because NTN reported them as being outside the ordinary course of trade. Pls.' Mem.Supp.Mot.J. Agency R. at 47–51. In support of its argument, NTN contends that sample sales cannot be considered sales in the ordinary course of trade pursuant to 19 U.S.C. § 1677b(a)(1),[3] because the merchandise sold as sample sales is not used by customers. *Id.* at 48. NTN also emphasizes that small quantity sales cannot be deemed ordinary due to the extremely small quantities involved. *Id.* Finally, NTN insists that Commerce's actions in the present review are inconsistent with its treatment of these sales in prior reviews. *Id.* at 48–51.

In the Final Results, Commerce explained its reasons for including the sales in question as home market sales:

Based upon our review of the record for these reviews and our recent [verification] of NTN ... we are not satisfied that NTN ... [has] provided evidence to substantiate that NTN's sample and small quantity sales ... are indeed outside the ordinary course of trade. The fact that respondents identify a sale as a sample or prototype or maintain an internal record of the sale as a

sample does not alone support the sales classification as outside the ordinary course of trade for the purposes of anti-dumping calculations.

Likewise, infrequent sales of small quantities of certain models or sales of models at a high price to only a few customers is also insufficient to establish a sale as outside the ordinary course of trade.

58 Fed.Reg. at 64,732.

This Court has upheld Commerce's decision to include NTN's zero price sales, sample sales and small quantity sales in its calculation of FMV in a previous case. *NTN Bearing Corp. of Am. v. United States* ("*NTN II*"), 19 CIT ——, ——, 905 F.Supp. 1083, 1090–91 (1995). In *NTN II,* the Court found that "NTN's sales information merely identifi[ed] certain sales as home market sample sales and other sales (including sample sales, sales with zero price, and sales that were infrequent) as not in the ordinary course of trade." *Id.* at ——, 905 F.Supp. at 1090–91. The Court further stated that "[w]ithout a complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade, Commerce cannot exclude those sales from FMV." *Id.* at ——, 905 F.Supp. at 1091. The evidence provided by NTN in *NTN II* is the same as the evidence provided in the review at issue. Further, in *NTN II,* Commerce explained its decision to include the sales in its calculation of FMV in the same manner as in the present case. This Court adheres to its decision in *NTN II,* and sustains Commerce's decision as supported by substantial evidence and in accordance with law.

### 7. *Comparison of Sales Across Different Levels of Trade*

■ In this review, NTN reported sales made at three levels of trade: original equipment manufacturers, distributors and aftermarket. Commerce, however, compared U.S. and home market sales across different levels of trade if there was no match at the

---

**3.** 19 U.S.C. § 1677b(a)(1)(A) (1988) instructs Commerce to compare the price of merchandise imported into the United States to the price of merchandise sold or offered for sale "in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption...."

same level of trade. *Final Results,* 58 Fed. Reg. at 64,730. It is NTN's position that Commerce's methodology results in the comparison of merchandise that is not approximately equal in commercial value. Pls.' Mem.Supp.Mot. J. Agency R. at 52–57. According to NTN, Commerce's actions are contrary to the definition of "such or similar merchandise" contained in 19 U.S.C. § 1677(16)(B). *Id.*

In rebuttal, Commerce argues that "level of trade" is not one of the criteria for selecting "such or similar merchandise" pursuant to 19 U.S.C. § 1677(16). Defs.' Opp'n to Pls.' Mot. J. Agency R. at 40. Commerce further responds that it determined that the merchandise sold at different levels of trade were approximately equal in value by using its twenty percent cost test. Pursuant to this test, Commerce compared the VCOM for the home market model proposed for comparison with the VCOM of the U.S. model, and if the difference was greater than twenty percent, it rejected the home market as a comparison model. *Id.* at 41; *see also Final Results,* 58 Fed.Reg. at 64,721.

This Court sustained Commerce's comparison of sales across different levels of trade as being in accordance with law in *NTN II,* 19 CIT at ——, 905 F.Supp. at 1092–93. *See also NTN Bearing Corp. of Am. v. United States,* 19 CIT ——, ——, 903 F.Supp. 62, 69 (1995); *NTN I,* 18 CIT at ——, 881 F.Supp. at 590–91; *NTN Bearing Corp of Am. v. United States,* 18 CIT ——, ——, 858 F.Supp. 215, 220–21 (1994). As NTN has not raised any new arguments persuading the Court to depart from its earlier decisions, the Court sustains Commerce on this issue.

### 8. *Level of Trade Adjustment*

▆▆ In addition to crossing levels of trade, Commerce allowed a level of trade adjustment to FMV based only on the indirect selling expenses. *Final Results,* 58 Fed.Reg. at 64,731. Commerce supported its determination with the following explanation:

Because NTN provided us with cost-based data demonstrating that it incurs different costs at difference levels of trade, we have granted NTN the adjustment. However, NTN's argument that a level of trade adjustment should be based on differences in price levels does not address the issue of whether the differences in price are due solely to the difference in level of trade, or whether there are other factors that affect price. Because we already make adjustments for NTN's direct selling expenses, we have based the level of trade adjustment on indirect selling expenses in order to avoid double counting the direct selling expenses.

*Id.*

NTN objects to Commerce's decision claiming that such an adjustment fails to account for price differences existing among levels of trade. Pls.' Mem.Supp.Mot.J.Agency R. at 57–68. In support of its position, NTN states that Commerce did not provide an explanation for its decision to reject NTN's claimed level of trade adjustment. NTN insists that Commerce placed an unfair burden on NTN by requiring proof concerning the reason for price differences. According to NTN, neither the statute nor the relevant regulation permitting adjustments to FMV require a showing that price differences result solely from differences in levels of trade. *Id.* at 61–67 (citing 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 353.58 (1993)).

Commerce responds that it properly denied NTN an adjustment based upon the full price differences among levels of trade because NTN failed to meet its burden of submitting evidence of entitlement to such a deduction. Commerce insists that its regulations authorize adjustments for differences in circumstances of sale resulting in price differences and not for the price differences themselves. Defs.' Opp'n to Pls.' Mot.J. Agency R. at 44–45. Commerce further maintains that the burden of establishing a claimed adjustment falls on the claimant. *Id.* at 46–47.

When Commerce compares sales at differing levels of trade, it is authorized to make a circumstance of sale adjustment pursuant to 19 U.S.C. § 1677b(a)(4)(B). The implementing regulation for this provision states:

In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the cir-

cumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference.

19 C.F.R. § 353.56(a)(1) (1993).

In *NTN II,* 20 CIT at ——, 905 F.Supp. at 1093–94, the Court upheld Commerce's denial of an adjustment where NTN failed to adequately support its claimed price differentials attributed to differences in levels of trade. In that case, as in the present one, NTN failed to quantify any price differentials directly attributable to differences in levels of trade. Thus, the Court finds that Commerce's denial of a level of trade adjustment for price differences is supported by substantial evidence and in accordance with law.

### 9. *Three Month Extended Period of Time Test*

■ In this review, Commerce used a period of three months to define "extended period of time" for the purpose of testing whether to include certain below cost sales for its calculation of FMV. *Final Results,* 58 Fed.Reg. at 64,729. NTN insists that "extended period of time" should be interpreted as meaning at least 50 percent of the period. Pls.' Mem.Supp.Mot.J. Agency R. at 69–71.

Commerce disagrees, arguing that 19 U.S.C. § 1677b(b) does not specify what constitutes an "extended period of time." Commerce notes that NTN has failed to provide any reason why a three month period is inadequate for the purpose of measuring below-cost sales since NTN does not suggest that TRBs are perishable or subject to seasonal fluctuations. As such, Commerce asserts that its interpretation of the statute is reasonable and should be sustained. Defs.' Mem. Opp'n to Pls.' Mot.J. Agency R. at 48–49.

This issue was addressed by the Court in *NTN I,* 18 CIT at ——, 881 F.Supp. at 592, where the Court found that absent information indicating that below-cost sales were a normal and expected characteristic of the trade in TRBs, Commerce's determination that three months constitutes an extended period of time is reasonable. *See also NTN,* 18 CIT at ——, 858 F.Supp. at 222. Therefore, this issue is hereby affirmed.

### 10. *Sales Made in Insufficient Quantities*

■ NTN contends that Commerce, in the Final Results, used sales in insufficient quantities in determining FMV contrary to 19 U.S.C. § 1677b(b). NTN states that the printouts contained in the record in this case do not clearly identify the quantity of home market bearings used to determine FMV. As such, NTN requests that this case be remanded so that Commerce may disclose the information to NTN or, in the alternative, may supplement the record with the necessary data. Pls.' Mem.Supp.Mot.J. Agency R. at 71–72.

Commerce opposes NTN's request for a remand arguing that NTN has already received adequate disclosure of the results of Commerce's final determination. Commerce emphasizes that NTN is unable to identify an example of the use of insufficient quantities of home market sales to calculate FMV. Defs.' Opp'n to Pls.' Mot. J. Agency R. at 50. Finally, Commerce asserts that 19 U.S.C. § 1677b(b) does not define "inadequate" and, therefore, Commerce has broad discretion in determining what constitutes "inadequate" above-cost sales. *Id.* at 50–52.

NTN presented identical arguments to this Court in *NTN I,* 18 CIT at ——, 881 F.Supp. at 593. This Court found that NTN had not demonstrated that Commerce had, in fact, used insufficient quantities of home market sales in determining FMV. *Id.* The Court further noted that NTN failed to cite any record reference indicating that it requested information from Commerce concerning this issue. *Id.* NTN has similarly failed to substantiate its claim in the present case. Accordingly, the Court affirms Commerce's determination on this issue.

### 11. *Bearing Design Type*

■ NTN contests Commerce's comparison of bearings of different design types. NTN argues that Commerce erred by comparing normal grade bearings with high precision grade bearings. NTN maintains that Commerce's model match methodology, sum of the deviations methodology and cost test all fail to recognize important distinctions

between normal grade and high precision grade bearings. As a result, NTN submits that Commerce compared highly dissimilar merchandise. Pls.' Mem.Supp.Mot.J. Agency R. at 72–75.

Commerce addressed NTN's concerns on this issue in the Final Results by providing the following explanation:

While other manufacturers also divide TRBs into design types, these design type categories are not consistent throughout the TRB industry. If we could not match across such categories, we would substantially limit the number of matches, thus working contrary to the statutory preference for price-to-price comparisons. If bearings are radically different, the sum of the deviations model-match methodology addresses the differences in physical criteria. In addition, any significant differences in component materials would be reflected in both the dynamic load ratio and Y factor and addressed by the 20–percent cap on the differences in the variable cost of manufacturing. Furthermore, NTN has not provided evidence demonstrating that HP [high precision] and normal precision bearings are being compared by the Department with distortive results.

58 Fed.Reg. at 64,721–22 (citation omitted).

Commerce's approach on this issue has previously been upheld by this Court in *NTN I*, 18 CIT at ——, 881 F.Supp. at 594, where the Court found that Commerce acted reasonably in comparing normal grade bearings with high precision grade bearings. The Court found that Commerce's methodology was reasonable and supported by law. Therefore, this issue is hereby affirmed.

### Conclusion

In accordance with the foregoing opinion, the Court finds that Commerce's actions are supported by substantial evidence and in accordance with law. For the reasons stated above, NTN's motion for judgment upon the agency record is denied in all respects, and the Final Results are affirmed. This case is hereby dismissed.

### JUDGMENT