NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Manufacturing Corporation and NTN Corporation, Plaintiffs,

v.

UNITED STATES, Defendant,

Federal–Mogul Corporation; The Torrington Company, Defendant–Intervenors.

Court No. 92–06–00423.
Slip Op. 95–156.

United States Court of International Trade.

Sept. 6, 1995.

Barnes, Richardson & Colburn (Donald J. Unger, Robert E. Burke, Kazumune V. Kano and Diane A. MacDonald), Chicago, IL, for plaintiffs NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Marc E. Montal-

bine), of counsel; Stephen J. Claeys, Stacy J. Ettinger, Thomas H. Fine, Alicia Greenidge, Dean A. Pinkert and Craig R. Giesze, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC, for defendant.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel, Joseph A. Perna, V and J. Eric Nissley), Washington, DC, for defendant-intervenor, Federal–Mogul Corporation.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Robert A. Weaver, John M. Breen and William A. Fennell), Washington, DC, for defendant-intervenor, The Torrington Company.

## OPINION

TSOUCALAS, Judge:

This case arises from the final administrative review determination of the International Trade Administration, United States Department of Commerce ("Commerce"), regarding ball bearings, cylindrical roller bearings and spherical plain bearings (collectively "antifriction bearings" or "AFBs") and parts thereof from Japan. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews (Final Results )*, 57 Fed.Reg. 28,360 (1992). Plaintiffs NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN") are manufacturers, exporters and/or importers of AFBs subject to the contested determination.

This action is before the Court on NTN's motion for judgment upon the agency record

pursuant to Rule 56.2 of the Rules of this Court.

### Background

On May 15, 1989, Commerce published antidumping duty orders on antifriction bearings and parts thereof from Japan, Germany, France, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan*, 54 Fed.Reg. 20,904 (1989).[1]

On June 28, July 19 and August 14, 1991, Commerce initiated administrative reviews of those orders with respect to sixty-three manufacturers and exporters, including NTN, for the period May 1, 1990 through April 30, 1991. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews*, 56 Fed.Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 40,305 (1991).

On March 31, 1992, Commerce issued its preliminary determinations in these second administrative reviews. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 57 Fed. Reg. 10,868 (1992).[2]

**1.** *See also Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 20,900 (1989); 54 Fed.Reg. 20,902 (France); 54 Fed. Reg. 20,903 (Italy); *Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania*, 54 Fed.Reg. 20,906 (1989); *Antidumping Duty Order of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Singapore*, 54 Fed.Reg. 20,907 (1989); *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof From Sweden*, 54 Fed.Reg. 20,-907 (1989); *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less*

*Than Fair Value: Ball Bearings and Parts Thereof From Thailand*, 54 Fed.Reg. 20,909 (1989); *Antidumping Duty Orders and Amendments to the Final Determinations of Sales at Less Than Fair Value: Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom*, 54 Fed.Reg. 20,910 (1989).

**2.** *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 57 Fed.Reg. 10,859 (1992); 57 Fed.Reg. 10,862 (Federal Republic of

On June 24, 1992, Commerce published one joint final determination for the nine administrative reviews. *See Final Results,* 57 Fed.Reg. at 28,360.

Against this background, NTN now moves pursuant to Rule 56.2 of the Rules of the Court for judgment upon the agency record with respect to certain aspects of the Final Results. In particular, NTN objects to the following actions by Commerce with respect to Japan: (1) deduction of direct selling expenses incurred on U.S. sales from the exporter's sales price instead of adding such expenses to the foreign market value ("FMV"); (2) recalculation of NTN's reported credit expense to eliminate the effect of compensating deposits; (3) inclusion of NTN's sample sales and other sales allegedly made outside the ordinary course of trade in calculating FMV; and (4) matching of U.S. sales with home market sales at different levels of trade and failing to make a level of trade adjustment reflecting the full difference in price between trade levels. *NTN's Motion for Judgment on the Agency Record and Memorandum in Support Thereof ("NTN's Brief")* at 1–26.[3]

NTN asserts that these alleged errors render the Final Results unsupported by substantial evidence and contrary to law. *NTN's Brief* at 2–4.

On August 5, 1992, the Court granted NTN's motion for a preliminary injunction enjoining the liquidation of NTN's unliquidated entries of subject AFBs from Japan during the pendency of this litigation in the United States Court of International Trade.

Defendant-intervenors Federal–Mogul Corporation ("Federal–Mogul"), a manufacturer in the United States of AFBs, and The Torrington Company ("Torrington"), the petitioner in the original investigation, oppose NTN's challenge. On September 24, 1992, and October 23, 1992, respectively, the Court granted Federal–Mogul's and Torrington's motions to intervene as defendants in this civil action.

## Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

1. *NTN's Direct Selling Expenses*

■ In accordance with its long-standing administrative practice, Commerce deducted NTN's direct selling expenses incurred on U.S. sales of antifriction bearings from the exporter's sales price ("ESP") pursuant to 19 U.S.C. § 1677a(e)(2) (1988).[4]

Germany); 57 Fed.Reg. 10,865 (Italy); 57 Fed. Reg. 10,875 (Sweden); 57 Fed.Reg. 10,878 (United Kingdom); *Ball Bearings and Parts Thereof From Romania; Preliminary Results Antidumping Duty Administrative Review,* 57 Fed.Reg. 10,-871 (1992); 57 Fed.Reg. 10,873 (Singapore); *Ball Bearings and Parts From Thailand; Preliminary Results of Antidumping Duty Administrative Review and Partial Termination of Administrative Review,* 57 Fed.Reg. 10,877 (1992).

**3.** Plaintiffs abandoned two of the eight counts in their complaint and combined counts to yield four issues for the Court's consideration. *See NTN's Brief* at 1 n. 1, 1–4.

**4. § 1677a. United States price**

(e) Additional adjustments to exporter's sales price

... [T]he exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

. . . . .

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise.

19 U.S.C. § 1677a(e)(2).

NTN argues that Commerce should have added those expenses to the foreign market value as a "circumstance-of-sale" adjustment pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988). *NTN's Brief* at 8–11. According to NTN, judicial precedent supports its position. *Id.* at 8–9 (citing to *NTN Bearing Corp. of Am. v. United States,* 17 CIT 272, 1993 WL 129799 (April 21, 1993), and other cases). NTN asserts that, pursuant to 19 U.S.C. § 1677b(a)(4), Commerce must treat direct selling expenses, whether attributable to home market or United States sales, as a circumstance of sale adjustment. *Id.* at 9–11.

Commerce concedes that the Court has previously held that 19 U.S.C. § 1677a(e) only covers indirect selling expenses and any adjustment for direct selling expenses must be made to FMV pursuant to 19 U.S.C. § 1677b(a)(4). *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendant's Brief")* at 6. However, Commerce argues that it has interpreted the language "expenses generally incurred by . . . the exporter in the United States" in § 1677a(e)(2) as encompassing direct and indirect selling expenses related to U.S. sales. *Defendant's Brief* at 6. In addition, Commerce argues that 19 U.S.C. § 1677b(a)(4) does not specifically address direct selling expenses incurred in ESP transactions. *Id.* Commerce elaborates contending that

> [b]ecause the entered value does not include any selling expenses incurred by or for the account of the 'exporter in the United states' (*i.e.,* the U.S. related party), the adjustment for all such expenses (direct and indirect) from the ESP is necessary to produce accurate deposit rates and assessment rates as well as to conform to the congressional intent that FMV be compared to an f.o.b. origin value.

*Id.* at 8.

Federal–Mogul essentially supports Commerce on this issue. *See Opposition of Federal–Mogul Corporation, Defendant–Intervenor, to NTN's Motion for Judgment on the Agency Record ("Federal–Mogul's Brief")* at 5–11. It is Torrington's position that a re-

mand on this issue would be impractical as only the estimated duty deposit rate would be affected. *See Memorandum of The Torrington Company in Opposition to Motion for Judgment on the Agency Record ("Torrington's Brief")* at 24.

This issue is governed by *Koyo Seiko Co. v. United States,* 36 F.3d 1565 (Fed.Cir.1994). In *Koyo Seiko,* the Court of Appeals for the Federal Circuit ("CAFC") found that the plain language of the statute is not dispositive on this question. *Koyo Seiko,* 36 F.3d at 1571. Guided by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the CAFC also concluded that neither the statute nor its legislative history evince Congress' "unambiguously expressed intent" with regard to the precise question at issue. *Koyo Seiko,* 36 F.3d at 1571–73 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.) Therefore, the court scrutinized the reasonableness of the agency's statutory interpretation. *Koyo Seiko,* 36 F.3d at 1573–75. The CAFC concluded that Commerce's treatment of U.S. direct expenses "evidences an attempt to make mirror-image adjustments to foreign market value and exporter's sales price so that they can be fairly compared at the same point in the chain of commerce." 36 F.3d at 1573. Finding Commerce's interpretation of the statute to be reasonable, the court deferred to Commerce's interpretation of its own statute. *Koyo Seiko,* 36 F.3d at 1575. *See also Koyo Seiko Co. v. United States,* 19 CIT ——, ——, 898 F.Supp. 915, 923 (1995); *NSK Ltd. v. United States,* 19 CIT ——, ——, Slip Op. 95–138 at 34–35, 1995 WL 463880 (Aug. 1, 1995).

As Commerce is not precluded from adjusting ESP by deducting therefrom certain direct selling expenses incurred in the United States, the Court affirms Commerce's treatment of NTN's U.S. direct selling expenses as supported by substantial evidence on the record and in accordance with law.

2. *Calculation of NTN's Home Market Credit Expense*

■ In this review, NTN's reported home market credit expense included an adjustment for compensating deposits.[5] Torrington protested that NTN's home market credit expense was inflated by the inclusion of compensating deposits. *Final Results*, 57 Fed.Reg. at 28,406. Commerce agreed with Torrington and recalculated NTN's credit costs "based on the firm's net interest expense (interest expense minus interest income) as most representative of the firm's internal cost of funds." *Id.*

NTN claims that compensating deposits were a factor affecting its net credit costs and that Commerce erred in not considering compensating deposits in calculating its interest rate. *NTN's Brief* at 11–13. NTN argues that its financial records substantiate its credit cost calculations and that the final determination fails to explain why Commerce rejected NTN's actual costs and why the recalculated rate is more accurate than the rate derived by NTN. *Id.* at 12–13.

NTN also argues that, assuming that Commerce properly rejected its claim pertaining to compensating deposits, Commerce's methodology was nevertheless flawed. Specifically, NTN claims that—in disregarding NTN's claimed adjustment—Commerce should have calculated NTN's home market credit expense based on its nominal interest rate. *Id.* at 13–14.

Commerce asserts that NTN failed to demonstrate that its compensating deposits were a prerequisite for any of its bank loans. *Defendant's Brief* at 12. In addition, Commerce requests a remand in order to recalculate NTN's credit costs to fully exclude the impact of compensating balances from NTN's costs calculations. *Id.* at 14.

Torrington asserts that Commerce properly based NTN's credit costs on the effective borrowing rate net of interest earned from compensating balances because NTN failed

to substantiate its home market credit expense methodology. *Torrington's Brief* at 6–9.

■ An administrative agency, generally, must cite the reasons for its decision in order that the reviewing court may ascertain whether the agency has acted arbitrarily. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). *See also Nachi–Fujikoshi Corp. v. United States*, 16 CIT 606, 609, 798 F.Supp. 716, 719 (1992). A court may, however, uphold an agency's decision of less than ideal clarity if the agency's path is reasonably discernible. *Nachi–Fujikoshi Corp.*, 16 CIT at 609, 798 F.Supp. at 719 (quoting *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed.Cir.1987) (citation omitted)). In *NTN Bearing Corp. of Am. v. United States*, 19 CIT ——, 881 F.Supp. 595 (1995), the Court reviewed Commerce's final determination issued in *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Final Results of Antidumping Duty Administrative Review*, 57 Fed.Reg. 4,960, 4,968 (1992). In that review, Commerce had recalculated NTN's reported credit expense because NTN had provided "inadequate justification" for its credit cost calculation based on compensating deposits. The Court, however, found that Commerce had inadequately explained the manner in which it calculated the deposit rate and the reasons for not using NTN's nominal interest rate. *NTN Bearing Corp.*, 19 CIT at ——, 881 F.Supp. at 603. In the present case, the Final Results provide no explanation whatsoever for Commerce's decision to recalculate NTN's reported credit expense beyond expressing agreement with Torrington that NTN's calculation should be rejected in light of the inclusion of compensating deposits.

As the Final Results do not adequately convey Commerce's basis for recalculating NTN's credit costs, the Court remands this

---

**5.** Compensating deposits, or balances, are bank deposits held as security for outstanding loans. Many banks require that a borrower maintain an average account balance equal to a percentage of the outstanding loan. This raises the real or effective interest rate of the loan. *See NTN Bear-*

*ing Corp. of Am. v. United States*, 835 F.Supp. 646, 651 (1993). *See also Timken Co. v. United States*, 16 CIT 999, 1003, 809 F.Supp. 121, 124 (1992); *PPG Indus. Inc. v. United States*, 14 CIT 522, 526 n. 8, 746 F.Supp. 119, 124 n. 8 (1990).

case to Commerce to explain its methodology and rationale. *See Id.* at ——, 881 F.Supp. at 603. *See also NTN Bearing Corp. v. United States,* 18 CIT ——, ——, 881 F.Supp. 584, 593 (1994); *NTN Bearing Corp. v. United States,* 18 CIT ——, ——, 858 F.Supp. 215, 222 (1994). If Commerce substantiates its rejection of NTN's claimed adjustment related to compensating deposits, Commerce should recalculate NTN's credit expense to fully exclude the impact of the compensating deposits.

### 3. *Ordinary Course of Trade*

■ In its reporting of home market sales, NTN's data earmarked for exclusion from Commerce's calculations, certain sales as made outside the ordinary course of trade. The coded sales included sample sales, sales with a zero price and sales where the total quantity of a particular bearing was five or fewer per month. *NTN's Brief* at 14–15. Commerce disregarded NTN's coding and included these sales when calculating FMV because NTN provided "insufficient evidence . . . to substantiate its claim that sales of sample and small quantities constitute sales made outside the ordinary course of trade." *Final Results,* 57 Fed.Reg. at 28,395.

NTN argues that, pursuant to 19 U.S.C. § 1677b(a)(1) (1988),[6] Commerce should have deleted the coded sample and small quantity sales from the home market database prior to calculating weighted average prices for FMV. *NTN's Brief* at 15.

NTN asserts that it is the intent of the parties to the transaction which is the overriding factor in determining whether sales are sample sales. *Id.* at 16. To substantiate that the contested sample and small quantity sales were made outside the ordinary course of trade, NTN relies on the certification of factual accuracy of its reporting. *Id.* at 16.

In addition, NTN argues that because Commerce excluded sample sales and other sales identified by NTN as not in the ordinary course of trade in another proceeding, it should have done so in the instant case as well. *NTN's Brief* at 15, 17 (citing *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,951, 4,959 (1992)).

In rebuttal, Commerce argues that NTN's bare allegation that its sales are what NTN purports them to be is insufficient to overcome the paucity of record evidence in this case. *Defendant's Brief* at 15.

■ As an initial matter, the Court notes that Commerce's treatment of sales in another proceeding is irrelevant to this case. The Court has stated that "Commerce's determinations must be examined on an individual basis taking into account all of the relevant facts of each case." *Nachi–Fujikoshi,* 16 CIT at 609, 798 F.Supp. at 719.

■ Moreover, "[d]etermining whether home market sales are in the ordinary course of trade requires evaluating not just 'one factor taken in isolation but rather . . . all the circumstances particular to the sales in question.'" *CEMEX, S.A. v. United States,* 19 CIT ——, ——, Slip Op. 95–72 at 6, 1995 WL 251561 (Apr. 24, 1995) (citing *Murata Mfg. Co. v. United States,* 17 CIT 259, 264–65, 820 F.Supp. 603, 607 (1993) (quoting *Certain Welded Carbon Steel Standard Pipes and Tubes From India, Final Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 64,753, 64,755 (1991)).

■ The Court has recognized that the plaintiff bears the burden of proving whether the sales used in Commerce's calculations are

---

**6.** According to 19 U.S.C. § 1677b(a)(1):

The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person . . .

(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the *usual commercial quan-*

*tities* and in the *ordinary course of trade* for home consumption. . . .

19 U.S.C. § 1677b(a)(1)(A) (emphasis added). Ordinary course of trade is defined as:

the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind.

19 U.S.C. § 1677(15) (1988).

outside the ordinary course of trade. *See Nachi–Fujikoshi*, 16 CIT at 608, 798 F.Supp. at 718. Furthermore, the "certification" requirement of 19 C.F.R. § 353.31 (1992) does not displace substantive burdens of proof which remain with the party who has access to the information. *Indus. Fasteners Group, Am. Importers Ass'n v. United States*, 710 F.2d 1576, 1582 n. 10 (Fed.Cir.1983). In this case, the administrative record contains little more than an allegation by NTN that the contested sales were made outside the ordinary course of trade.[7] *See* Japan P.R. Document No. 307, Frames 327, 342. Therefore, NTN has failed to establish entitlement to the claimed exclusion from Commerce's calculation.

As NTN has failed to carry its burden of proof on this question, the Court sustains Commerce's inclusion of the contested sales in its calculation of FMV as reasonable and in accordance with law. *See Timken Co. v. United States*, 18 CIT ——, ——, 865 F.Supp. 850, 853 (1994). *See also Nachi–Fujikoshi*, 16 CIT at 608–09, 798 F.Supp. at 718–19.

4. *Comparison of Sales Across Different Levels of Trade and Level of Trade Adjustment*

■ In this review, Commerce determined that NTN's sales were made at three levels of trade: original equipment manufacturers ("OEMs"), distributors and aftermarket. *Final Results*, 57 Fed.Reg. at 28,391. The Final Results stated:

> NTN argues that the Department should have either not crossed levels of trade, and then made comparisons to CV [constructed value], or should have made a level-of-trade adjustment when levels of trade were crossed. Such an adjustment should be based on, preferably, differences in selling prices at the different levels of trade, or else on the difference in indirect selling expenses.

*Id.* Commerce compared NTN's sales at the different levels of trade. *Id.*, 57 Fed.Reg. at 28,392 (citing to 19 C.F.R. § 353.58 (1992)).

In addition, Commerce made a circumstance of sale adjustment for differences in indirect selling expenses at the identified trade levels, explaining: "NTN quantified indirect selling expenses incurred at different levels of trade. Therefore, in comparisons made across levels of trade, we have accepted the differences in these expenses as attributable to level-of-trade, and we have granted an adjustment accordingly." *Final Results*, 57 Fed.Reg. at 28,392.

NTN concedes that judicial precedent upholds Commerce's prerogative to match sales at different trade levels absent sales at the same level of trade. *NTN's Brief* at 18 (citing *Koyo Seiko Co. v. United States*, 17 CIT 474, 840 F.Supp. 136 (1993), *aff'd*, 20 F.3d 1156 (Fed.Cir.1994), and cases cited therein). However, NTN objects to Commerce's failure to grant, or explain its denial of, a circumstance of sale adjustment for differences affecting price comparability across levels of trade. *NTN's Brief* at 17–26.

It is NTN's position that an adjustment for indirect selling expenses between levels of trade alone does not achieve the regulatory purpose of 19 C.F.R. § 353.58 "to adjust 'for differences affecting *price* comparability' or the statutory mandate [of 19 U.S.C. § 1677b(a)(4)(B)] that 'due allowance be made . . .' for such differences." *Id.* at 19. NTN also maintains that the statute's legislative history clearly indicates that differences in level of trade were among the adjustments contemplated by 19 U.S.C. § 1677(b)(a)(4). *NTN's Brief* at 19 (citing H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979)). NTN also asserts that circumstance of sale adjustments must be accurately made to effect fair comparisons. *NTN's Brief* at 18–19 (citing *Smith–Corona Group, Consumer Prods. Div., SCM Corp. v. United States*, 713 F.2d 1568 (1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)).

NTN insists that the administrative record establishes its claimed price differentials across trade levels. *NTN's Brief* at 20 (citing to Japan C.R. Document No. 7, Reel 11,

---

7. The Japan public record of this administrative review is designated "P.R." The confidential record is designated "C.R."

Frame 1, 18). Further, according to NTN, the fact that sales are made to different types of customers creates a rebuttable economic presumption that the levels of trade to which it sells have an impact on price and, ultimately, on fair market value. *NTN's Brief* at 20. NTN relies on *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 16 CIT 1008, 808 F.Supp. 841 (1992), *rev'd on other grounds,* 13 F.3d 398 (1994), for this proposition. NTN requests that the Court order Commerce to either not cross levels of trade when matching sales or that it make a level of trade adjustment to account for price differences in the three recognized levels of trade. *NTN's Brief* at 26.

To quantify its level of trade adjustment request, NTN provided Commerce with large percent ranges by which it claimed its selling prices differed. Japan C.R. Document No. 7, Reel 11, Frame 1, 18. Commerce maintains that NTN's request for a level of trade adjustment for price differences was deficient in several respects and did not support entitlement to the desired adjustment. *NTN's Brief* at 19–20.

In addition, Commerce asserts that its explanation in the Final Results that it had accepted NTN's "quantified" indirect selling expenses, implied that it had rejected NTN's claim concerning differences in selling price because that claim was not quantified. *Id.* at 22 (referring to *Final Results,* 57 Fed.Reg. at 28,392).

Title 19, United States Code, section 1675(a) (1988) requires Commerce to calculate the difference between the foreign market value and the United States price of the imported merchandise. Before calculating FMV, Commerce must first identify, for each U.S. sale, a comparison home market sale. If identical merchandise, as defined in 19 U.S.C. § 1677(16) is not available, Commerce must then proceed to select similar merchandise as defined in subsections (B) or (C) of 19 U.S.C. § 1677(16).

The Court has, on several occasions, affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. *See, e.g., NTN Bearing Corp.,* 18 CIT at ——, 881

F.Supp. at 590–91. *See also NTN Bearing Corp.,* 18 CIT at ——, 858 F.Supp. at 220–21; *Koyo Seiko Co.,* 17 CIT at 475–78, 840 F.Supp. at 139–40; *NTN Bearing Corp.,* 17 CIT at 1151–53, 835 F.Supp. at 649. Thus Commerce's comparison of sales across different levels of trade was in accordance with law.

Commerce is required, under certain circumstances, to make adjustments to the United States price and to FMV in its price comparisons in order to accurately calculate dumping margins. 19 U.S.C. § 1677b(a)(4). Level-of-trade adjustments are governed by 19 C.F.R. § 353.58 which provides:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise *and make appropriate adjustments for differences affecting price comparability.*

(Emphasis added.)

A party claiming a level-of-trade adjustment has the burden of proving entitlement to the adjustment. *See Fundicao Tupy, S.A. v. United States,* 12 CIT 6, 8, 678 F.Supp. 898, 899–900, *affd,* 859 F.2d 915 (Fed.Cir.1988). Commerce "cannot adjust prices for level of trade differences in the absence of quantifying evidence to substantiate the request." *Hercules, Inc. v. United States,* 11 CIT 710, 750, 673 F.Supp. 454, 487 (1987).

In this case, NTN officially requested a circumstance of sale adjustment from Commerce for differences in prices between levels of trade. *See* Japan P.R. Document No. 656, Reel 8, Frame 2,118. NTN substantiated that it sold products at various levels of trade. *Id.* It is undisputed that NTN's Section C response at Exhibit C–4 demonstrated that NTN's indirect selling expenses varied with level of trade and that NTN quantified those variances. *See* Japan C.R.

Document No. 63, Reel 15, Frame 756. In addition, NTN attempted to quantify differences in prices between levels of trade. *See* Japan C.R. Document No. 7, Reel 11, Frame 1, 18.

Commerce contends that the Final Results address, by implication, its denial of NTN's requested adjustment for the full difference in selling price allegedly caused by differences in level of trade. The Court finds Commerce's explanation inadequate.

Counsel for Commerce suggests, *post hoc,* that the information which NTN submitted to support a level of trade adjustment for price differences was insufficient and precluded any further adjustment. First, Commerce claims that NTN failed to provide worksheets to demonstrate how its percent ranges were calculated. Second, Commerce maintains that although NTN claimed that the prices at one level of trade exceeded those at another by a range of percentages, NTN failed to explain what part of that large percent range Commerce should use. Third, Commerce asserts that while NTN compared the prices of various levels of trade to OEMs, it did not compare those levels to each other. Commerce claims that, consequently, it had no way of knowing what adjustment to make if two of those levels of trade were compared. In addition, Commerce contends that NTN provided no evidence to show that alleged differences in selling price between trade levels were actually caused by differences in levels of trade rather than by other factors such as volume discounts, selling expenses or actual dumping. Finally, Commerce contends that NTN failed to demonstrate that Commerce had not already accounted for any differences by way of other adjustments, such as the adjustment for differences in selling expenses. *Defendant's Brief* at 19–21.

 The Court sees none of the foregoing concerns of counsel, legitimate as they might be, expressed by Commerce in the Final Results. Commerce's specific concerns bearing on the appropriateness of a level of trade adjustment for price differences, or its quantification, should have been articulated by Commerce in the Final Results. *Post hoc* rationalization, for which there is no ex-

pressed basis in the agency's determination under judicial review, cannot supply what is deficient in the Final Results. *See Sugiyama Chain Co. v. United States,* 19 CIT ——, ——, 880 F.Supp. 869, 874–75 (1995).

Therefore, to afford Commerce an additional opportunity to address the level of trade issue, the Court remands this case to Commerce for a full explanation of its rationale for rejecting NTN's request for a level of trade adjustment for price differences, thus eliminating the need for speculation as to the basis for Commerce's determination on this issue. *See Sugiyama,* 19 CIT at ——, 880 F.Supp. at 875; *NTN Bearing Corp.,* 18 CIT at ——, 858 F.Supp. at 221.

## CONCLUSION

For the reasons stated herein, the Court remands this case to Commerce to explain its methodology and rationale for recalculating NTN's credit costs to eliminate the effect of compensating deposits. If Commerce substantiates its rejection of NTN's claimed adjustment, Commerce should recalculate NTN's credit expense to fully exclude the impact of compensating deposits. In addition, Commerce is to fully explain its rationale for rejecting NTN's request for a level of trade adjustment for differences in selling prices at the identified levels of trade. Commerce's Final Results are sustained in all other respects.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

## ORDER

This case having been duly submitted for decision following plaintiffs' motion for judgment on the agency record, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in accordance with said decision,

**IT IS HEREBY ORDERED** that plaintiffs' motion is granted to the extent that this

case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to explain its methodology and rationale for recalculating plaintiffs' credit costs to eliminate the effect of compensating deposits. If Commerce substantiates its rejection of plaintiffs' claimed adjustment, Commerce is to recalculate plaintiffs' credit expense to fully exclude the impact of compensating deposits; and it is further

**ORDERED** that Commerce is to fully explain its basis for rejecting plaintiffs' request for a level of trade adjustment for price differences in the identified levels of trade; and it is further

**ORDERED** that Commerce's determination is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.